UNITED STATES DISTRICT COURT
EASTERN DISTRICT NEW YORK

------------------------------------------------------x

PHILIP DATZ,

        Plaintiff,

     - against -

MICHAEL MILTON, in his individual and
Official capacities, and the COUNTY OF
SUFFOLK

        Defendants.

------------------------------------------------------x

SUMMONS ISSUED

CV 12-1770

12 Civ.

**COMPLAINT**

**Trial by Jury Demanded**

WEXLER, J.

### NATURE OF THE ACTION

1.     This is a civil rights action challenging Suffolk County's policy, custom and practice of obstructing the First Amendment right of the press and the public to gather and record news and information about police activity in public places. This action specifically arises from the unconstitutional arrest and detention of Philip Datz, a professional photojournalist, for lawfully filming official police conduct that took place in public.

2.     On July 29, 2011, Mr. Datz was filming a scene of official police activity that took place on a public street, in plain view. He wore his press credentials prominently around his neck, and he filmed from a public sidewalk where bystanders were watching the same police activity, across a street that remained open to traffic. He did not cross any police lines or interfere with police activity. Upon noticing Mr. Datz with his video camera, Suffolk County Police Sergeant Michael Milton ("Sergeant Milton") charged at Mr. Datz, grabbed him by his press lanyard, and demanded that he stop filming the scene and "go away." Sergeant Milton did not ask any other bystanders to leave, and he refused to specify an alternate location where Mr. Datz would be able to film. When Mr. Datz resumed filming from a location further removed

1

from the police scene, Sergeant Milton – clearly irate at what he saw as a challenge to his authority – sped his patrol car at high speed directly at Mr. Datz, forcibly seized his camera and videotape, and arrested him. Mr. Datz was then taken to the Suffolk County Police Department's Fifth Precinct, where he was handcuffed to a desk. After spending approximately two hours in police custody, Mr. Datz was released and charged with obstructing governmental administration, in violation of N.Y. Penal Law § 195.05. The Suffolk County District Attorney later dismissed the criminal charge against Mr. Datz, recognizing that there was no lawful basis for it.

3.      Mr. Datz's unlawful arrest and detention was not a rogue event. Suffolk County police officers have a longstanding and ongoing pattern of unlawfully interfering with the recording of police activity conducted in public view. This pattern stems from an unconstitutional policy, custom and practice by Suffolk County that gives officers excessive discretion to prevent such recording; a lack of adequate training regarding the right to engage in such recording; a failure to supervise and discipline officers who retaliate against or interfere with this right; and deliberate indifference to a culture of disregard for the constitutional protections for this right.

4.      The right of the press and public to observe and record official police activity in public places goes to the core of the First Amendment. As a member of the press with a local news beat, it is the essence of Mr. Datz's job to cover public scenes of police response to criminal activity, accidents, and fires, and to provide footage of those scenes to local news broadcasters for timely reports to the public. It is through reporting such as Mr. Datz's that citizens on Long Island and across the country stay abreast of local events and important issues in their communities. But filming police officers engaging in their official duties has

significance beyond the role of the press in keeping citizens informed about current events. As the U.S. Department of Justice recently stated, the First Amendment right to record police officers in public is "consistent with our fundamental notions of liberty, promote[s] the accountability of our governmental officers, and instill[s] public confidence in the police officers who serve us daily."[1]

5.      Sergeant Milton violated Mr. Datz's clearly established First Amendment right to record official police activity in a public location. He also violated Mr. Datz's clearly established Fourth Amendment right to be free from arrest and seizure of his property without probable cause to believe that he was engaged in any criminal activity. In doing so, Sergeant Milton was acting pursuant to Suffolk County's policy, custom and practice of preventing individuals from filming scenes of police activity conducted in public view. It was this unconstitutional policy, custom and practice that gave Sergeant Milton the confidence to boast to Mr. Datz, as his camera was running: "I've been doing this for 30 years. There is nothing you can hold over my head." With this civil rights suit, Mr. Datz seeks declaratory relief for the violation of his constitutional rights; compensatory and punitive damages for the unlawful actions of Sergeant Milton and Suffolk County; and injunctive relief barring Suffolk County from interfering with the First Amendment rights of the public and press and directing it to implement an effective policy to train its officers on the First Amendment right of the public and press to record police activity in public locations and to appropriately discipline those officers who violate this constitutional right.

---

[1] Statement of Interest of the United States at 1, *Sharp v. Baltimore City Police Dep't*, No. 11 Civ. 2888 (D. Md. Jan. 10, 2012), ECF No. 24.

**PARTIES**

6.     Plaintiff Philip Datz is a 35-year-old resident of the State of New York. Mr. Datz is an independent professional photojournalist who has worked for Stringer News Service for the past four years, including at all times relevant to this complaint.

7.     Defendant Michael Milton was at all times relevant to this complaint a duly appointed police officer of the Suffolk County Police Department holding the rank of sergeant in the Fifth Precinct. His actions as alleged in this complaint were taken under color of the laws of the State of New York and Suffolk County. Upon information and belief, Sergeant Milton is a resident of Suffolk County and the State of New York. He is sued in his individual and official capacities.

8.     Defendant Suffolk County is a municipality within the State of New York. The Suffolk County Police Department ("SCPD") is an administrative arm of Suffolk County. Defendant Suffolk County is responsible for the administration and operation of the SCPD and charged with the employment, control, supervision, discipline, training, and practices of SCPD personnel and employees and with formulation of SCPD policies, customs and practices of SCPD personnel and employees.

**JURISDICTION AND VENUE**

9.     This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 2000aa-6(a), and the First, Fourth, and Fourteenth Amendments to the United States Constitution. This Court has subject matter jurisdiction over all federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and it has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

4

10.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District and because all defendants reside in this District.

## FACTUAL BACKGROUND

**A.     Mr. Datz's Unlawful Arrest and Detention for
        Filming Police Activity in a Public Place**

11.     Mr. Datz is an independent, professional, credentialed photojournalist who works for Stringer News Service, with eight years of experience covering local news in Suffolk and Nassau Counties.  His video news footage is regularly licensed to local and national television networks, including ABC, NBC, Fox, CBS, News 12, FiOS1, CNN, and Newsday, for use in news broadcasts.  Mr. Datz often covers breaking news events, including the events at issue herein.

12.     Mr. Datz is a member of the National Press Photographers Association ("NPPA"), a 501(c)(6) nonprofit organization dedicated to the advancement of visual journalism in its creation, editing, and distribution. Since 1946, NPPA has vigorously promoted freedom of the press in all its forms, especially as that freedom relates to visual journalism.  Mr. Datz is also a member of the Society of Professional Journalists.

13.     As a local photojournalist, Mr. Datz is often assigned to cover police actions taking place in Suffolk County.  As a result, he interacts with Suffolk County police officers on a regular basis.

14.     On July 29, 2011, Mr. Datz learned of police pursuit of a car taking place on Sycamore Avenue, a major public thoroughfare in Bohemia, New York. He told a local news station, News 12, that he would cover the story.

15.     By the time Mr. Datz arrived on the scene at approximately 6:00 p.m., the pursuit had ended and the suspect was in police custody. There were several police cars parked in front of 744 Sycamore Avenue, but Sycamore Avenue remained open to traffic, and the sidewalk was open to pedestrians.

16.     At no time was any police tape or marker set up to delineate the perimeter of a crime scene.

17.     Mr. Datz parked his car in a parking area at Sycamore Avenue Elementary School, across the street from the scene of police activity. Using his professional video camera, he commenced filming from the public sidewalk in front of the school. Mr. Datz was filming official police conduct that was open to public view.

18.     At all times, Mr. Datz prominently displayed his press credentials issued by the Nassau County Police Department, which are valid and accepted in Suffolk County.

19.     Within a few seconds after Mr. Datz began filming, an officer later identified as Sergeant Milton strode away from the police scene, crossed the street, and approached Mr. Datz, ordering him to "go away."

20.     Mr. Datz captured his encounter with Sergeant Milton on video. The video, which may be viewed online at http://www.youtube.com/watch?v=oI38MnpAlW4, is incorporated by reference herein.

6

21.     Mr. Datz asked Sergeant Milton repeatedly where he could go to continue filming, but Sergeant Milton refused to identify any location.  Sergeant Milton grabbed Mr. Datz's press lanyard, which Mr. Datz wore around his neck, and began to take down Mr. Datz's information.  While holding Mr. Datz in place by his lanyard, Sergeant Milton stated that if Mr. Datz did not leave, he would "get locked up."

22.     Mr. Datz repeatedly asked Sergeant Milton where he would like Mr. Datz to move in order to continue filming.  Sergeant Milton repeatedly refused to designate an alternate location where Mr. Datz would be allowed to film.  In one exchange, Sergeant Milton told Mr. Datz that there was "no place" he would be able to film.

23.     When asked why Mr. Datz was not permitted to film from this public location, Sergeant Milton stated that there was a "current investigation" and an "active scene."

24.     As the video of this encounter shows, at least two bystanders were standing in the same area as Mr. Datz during this exchange, watching the same police activity that Mr. Datz was filming.  At no point was either bystander approached by Sergeant Milton or asked to leave.

25.     When Mr. Datz suggested calling the SCPD Public Information Office for advice, Sergeant Milton replied: "You can call and talk to the Commissioner for all I care.  You're going away."  He continued: "You understand, I've been doing this for 30 years.  There is nothing you can hold over my head or anybody out there.  Go away."

26.     In response to Sergeant Milton's aggressive behavior, Mr. Datz placed his camera in his car and drove further away from the scene.

7

27.     Mr. Datz resumed filming from the corner of Lanson Street and Sycamore Avenue, at least 500 feet away from the police scene. He stood on a public sidewalk, across a street and over a block away from the scene of police activity. The street was open, and pedestrians were walking on the sidewalk near Mr. Datz.

28.     After Mr. Datz had been filming for approximately a minute at this new location, Sergeant Milton drove his squad car away from the police scene and directly toward Mr. Datz at high speed, stopping the car just in front of Mr. Datz. This threatening conduct by Sergeant Milton placed Mr. Datz in reasonable fear of imminent bodily injury.

29.     Sergeant Milton jumped out of his car, forcibly removed Mr. Datz's video camera from his shoulder, and told Mr. Datz that he was under arrest. He pushed Mr. Datz up against the squad car and handcuffed him with his hands behind his back.

30.     Sergeant Milton did not ask or order Mr. Datz to leave his new location prior to arresting him.

31.     Mr. Datz's professional video camera and its contents were seized during his arrest.

32.     Mr. Datz was brought to a squad car by two officers from the SCPD Fourth Precinct. When he asked the officers to adjust his handcuffs, one of the officers told him to "shut up and get in the car."

33.     Mr. Datz was then driven in a SCPD police car to the SCPD Fifth Precinct in Patchogue. While in police custody at the Fifth Precinct, he was fingerprinted and handcuffed to a desk.

34.     While Mr. Datz was in police custody, he was ordered by two SCPD officers to remove the videotape from his professional video camera and turn it over as evidence.

35.     The videotape in the video camera contained footage from several assignments from earlier that day, which Mr. Datz and his employer intended to license to news organizations for broadcast on that evening's news.  Mr. Datz explained to the SCPD officers that the videotape contained footage from other news stories and asked to keep the videotape.  The SCPD officers refused and told Mr. Datz that if he did not surrender the videotape, his entire camera would be confiscated as evidence.

36.     In compliance with the order of the SCPD officers, Mr. Datz removed the videotape from the camera under protest and handed it to one of the SCPD officers.  On information and belief, an SCPD lieutenant was also present at the time Mr. Datz's videotape was seized.

37.     From the time of his arrest, Mr. Datz made repeated requests for phone calls, which were denied.   After more than an hour in police custody, SCPD officers finally permitted Mr. Datz to make a telephone call to Stringer News Service.

38.     Mr. Datz was held at the Fifth Precinct police station until approximately 8:30 p.m.  Upon his release, his property was returned with the exception of the videotape from his camera, which was detained.

39.     At the time of his release from police custody, Mr. Datz received a desk appearance ticket for "obstructing governmental administration" in violation of N.Y. Penal Law § 195.05.

40.     SCPD Deputy Chief Chris Bergold was present at the Fifth Precinct police station while Mr. Datz was in police custody. Deputy Chief Bergold was apprised of the facts surrounding Mr. Datz's arrest and was aware that Mr. Datz was being charged with a violation of N.Y. Penal Law § 195.05. Deputy Chief Bergold was also aware that the videotape from Mr. Datz's video camera had been seized by the SCPD and that it was not returned to Mr. Datz at the time of his release.

41.     The videotape from Mr. Datz's camera was not returned to him until approximately one hour after his release from custody. By that time, Mr. Datz was no longer able to license the time-sensitive footage from that day's other assignments for use on the evening news.

42.     Sergeant Milton, Deputy Chief Bergold and all other SCPD officers who participated in the seizure of Mr. Datz's camera and videotape knew that they contained work product and documentary material generated and possessed by a member of the news media for the purpose of dissemination to the public via broadcast in interstate commerce.

43.     Defendants arrested and detained Mr. Datz, seized his video camera and videotape, and charged him with a criminal offense for filming police activity in a public location and without any probable cause to believe Mr. Datz had committed a crime.

44.     The arrest report for Mr. Datz's arrest contains knowingly false statements by Sergeant Milton. In that report, Sergeant Milton falsely states that Mr. Datz "refuse[d] to leave the developing crime scene." In fact, Mr. Datz did leave his initial position in response to Sergeant Milton's unlawful order. Mr. Datz was never asked or ordered by Sergeant Milton to leave his second location before he was arrested.

10

45.     Recognizing that Mr. Datz's arrest had been unlawful and that the criminal charge against him was baseless, the Suffolk County District Attorney voluntarily dismissed the charge against Mr. Datz on or about August 9, 2011.

46.     As a result of his arrest, Mr. Datz suffered physical, psychological, and professional injuries.

47.     Mr. Datz's shoulder was injured during his arrest, requiring him to seek medical assistance at Stony Brook University Medical Center on August 5, 2011. Due to his injury, Mr. Datz was unable to work for at least a week after his arrest.

48.     As a result of the shoulder injury sustained during his arrest, Mr. Datz is no longer able to operate certain types of professional camera equipment, including the type of camera he was using on the day of his arrest. This limitation has required him to turn down professional assignments where such equipment is necessary.

49.     After his ordeal, Mr. Datz was told that the SCPD Internal Affairs Bureau would investigate his arrest. Mr. Datz was interviewed by the Internal Affairs Bureau in connection with that investigation on August 15, 2011. At that time, Mr. Datz was told that he would be notified of the outcome of the investigation.

50.     Mr. Datz was subsequently told that the Internal Affairs investigation has been completed, but, to date, Mr. Datz has not been informed of the outcome of the investigation.

51.     Upon information and belief, Sergeant Milton has faced no disciplinary action for his conduct and continues to serve in active duty as a sergeant with the SCPD.

11

**B.**    **Suffolk County Police Have Engaged in a Policy, Custom and Practice of Obstructing and Preventing Citizens and Members of the Press from Recording Police and Other Official Activity in Public Locations**

      **(i)**    *Suffolk County Officers Regularly Obstruct and Prevent Individuals from Recording Official Activity Open to Public View*

52.    Mr. Datz's unlawful arrest on July 29, 2011, was not an isolated incident. Suffolk County police officers have repeatedly obstructed and/or prevented Mr. Datz and other journalists from filming police activity and other official activity conducted in public view, both prior to and since Mr. Datz's arrest. Mr. Datz and other journalists have reported these incidents to the SCPD Public Information Office and other Suffolk County officials, but no meaningful action has been taken by Suffolk County in response.

53.    The following non-exclusive list of examples illustrates the widespread unconstitutional pattern and practice among SCPD officers of obstructing and/or preventing members of the media from filming police activity in public locations, which culminated in Mr. Datz's unlawful arrest on July 29, 2011:

        a.    In mid-July 2009, SCPD Sixth Precinct Officer Ramses Cerdas told Mr. Datz that he could not record from a public street a scene of police activity on Granny Road in Farmingville, New York, because his Nassau County press credentials were not valid in Suffolk County. Officer Cerdas demanded that Mr. Datz "shut it off," referring to Mr. Datz's camera; attempted to stop Mr. Datz from filming the police activity; and then prevented Mr. Datz from filming at a closer location were bystanders were viewing the event. Mr. Datz's credentials are in fact valid in Suffolk County, and his constitutional right to record a scene of police activity in

public was not dependent on those credentials. Mr. Datz lodged a complaint by email following this incident and met with SCPD Assistant Chief of Patrol Patrick Cuff to discuss the incident. Chief Cuff acknowledged that Officer Cerdas was incorrect regarding the press pass and did not have a legitimate reason to make Mr. Datz stand further back than the public or direct him to turn his camera off. Chief Cuff told Mr. Datz that he would speak to Officer Cerdas, but Mr. Datz had a further incident with the same officer.

b.  On or about September 10, 2009, Mr. Datz was ordered to leave the scene of a house fire on Canterbury Drive in Coram, New York, by SCPD Officer Cerdas, the same SCPD Sixth Precinct officer involved in the July 2009 incident on Granny Road. Mr. Datz had been filming from a public street when ordered to leave. Mr. Datz reported the incident to the SCPD Public Information Office, but no meaningful action was taken.

c.  On or about March 9, 2010, Mr. Datz was filming police activity at a homicide scene in Mastic Beach, New York, from the yard of a homeowner who granted him permission to enter and remain on her property. An officer from the SCPD Seventh Precinct ordered Mr. Datz and a fellow journalist to cease filming and stated that he was rescinding the homeowner's permission for them to be on her property. The officer then proceeded to put up crime scene tape around the homeowner's property—even though it was unrelated to the crime scene—for the purpose of keeping the media from viewing and filming the police

13

activity. Mr. Datz reported the incident to the SCPD Public Information Office, but no meaningful action was taken.

d.  On or about April 6, 2010, Mr. Datz was harassed by SCPD Sergeant Larkin for filming from a public street the scene of a car crash in Bellport, New York. The sergeant demanded Mr. Datz's identification and attempted to confiscate his press credentials. Mr. Datz reported the incident to the SCPD Public Information Office, but no meaningful action was taken.

e.  On or about September 4, 2010, Mr. Datz was prevented from filming a scene of joint police and fire department activity at a building fire in Lindenhurst, New York. A Suffolk County Fire Department officer ordered Mr. Datz to cease filming from a public sidewalk and leave the scene, without justification. The official grabbed Mr. Datz's camera and threatened him with arrest. SCPD First Precinct officers were on the scene and escorted Mr. Datz away from the scene to a location where it was difficult to see the fire. Meanwhile, members of the public were allowed to remain at the scene. Mr. Datz reported the incident to the SCPD Public Information Office, but no meaningful action was taken. Mr. Datz's employer emailed the Fire Rescue Commissioner about the incident, and Mr. Datz spoke with the Fire Rescue Commissioner weeks later at a drill. The Fire Rescue Commissioner told Mr. Datz he would follow up on the incident, but no meaningful action was taken.

f.    On or about May 6, 2011, Mr. Datz was detained by a SCPD Third

Precinct officer at a homicide scene outside a bar in Central Islip, New

York, and told that he could not film the police scene from a public

sidewalk, even though Mr. Datz was located outside the marked perimeter

of the crime scene. The SCPD officer required Mr. Datz to turn over his

driver's license and press pass, which were subsequently returned to him.

The officer told Mr. Datz he would expand the crime scene perimeter if

Mr. Datz did not stop filming. An SCPD lieutenant then directed that the

crime scene perimeter be expanded, which had the effect of precluding

further filming or viewing of the crime scene. Mr. Datz reported the

incident to the SCPD Public Information Office, but no meaningful action

was taken.

g.    On or about June 22, 2011, Mr. Datz and approximately six fellow

journalists were obstructed by Suffolk County police officers and

detectives in Medford, New York, from filming the arrest of a suspect in a

recent high-profile mass shooting at a local business. Mr. Datz and his

fellow journalists were filming from a public street and did not cross any

police lines. One of the police officers drove his car back and forth to

obstruct the media's ability to film the scene and directed members of the

media to leave, and SCPD detectives threatened members of the media

with arrest if they stayed in the area, while allowing bystanders to remain.

Mr. Datz reported the incident to the SCPD Public Information Office, but

no meaningful action was taken.

15

54.     This widespread unconstitutional practice has persisted among SCPD officers even after Mr. Datz's unlawful arrest on July 29, 2011. For example:

a.      On or about August 6, 2011, officers from the SCPD Seventh Precinct prevented Mr. Datz and four fellow journalists from accessing a public sidewalk on a bridge in Moriches, New York, which overlooked the scene of a motor vehicle accident. The bridge remained open to the public, but the officer on site told journalists that members of the press were not allowed on the bridge. Mr. Datz and others reported the incident to the SCPD Public Information Office, which informed them that the SCPD Commissioner and Chief of Detectives were present at the scene and would be communicating to officers that the press should be allowed to record the police activity, but that did not happen. Mr. Datz was told later by SCPD Deputy Chief Bergold that Chief Bergold would look into the matter, but Mr. Datz received no further word about any investigation or action taken.

b.      On or about August 28, 2011, Mr. Datz and a fellow journalist were prevented by SCPD Third Precinct officers from recording the scene of a house fire and suspected arson in Brentwood, New York. Suffolk County police officers deliberately expanded the marked perimeter of the crime scene upon arrival of the media to prevent them from filming the scene from the public sidewalk. Sometime after the media left, the officers made the crime scene smaller again. Mr. Datz reported the incident to the SCPD Public Information Office, but no meaningful action was taken.

16

c.     On or about November 11, 2011, Mr. Datz and a fellow journalist were prevented from recording a scene of police activity relating to a suicide at Browns River Road No. 2 in Bayport, New York. Mr. Datz and his fellow journalist were filming from a public street, standing well outside the marked perimeter of the scene, and were not interfering in any way with police activity. Nevertheless, they were approached almost immediately by officers from the SCPD Fifth Precinct and ordered to stop filming. The officers then expanded the area of the scene of police activity by approximately 2,000 feet, extending it around the corner of the road to hide the scene of police activity from view. When Mr. Datz inquired about why he and the other journalists were being required to move back, the sergeant in charge of the scene, Sergeant Reilly, said "there are certain things that just should not be on TV," or words to that effect. Meanwhile, other members of the public were allowed to remain inside the newly expanded perimeter. When Mr. Datz asked the Public Information Office how to file a formal complaint, he was informed that there was no formal procedure and he should send an email. Mr. Datz sent an email to the SCPD Public Information Office about the incident, but no meaningful action was taken.

d.     On November 16, 2011, Mr. Datz was obstructed by Suffolk County police officers from filming the arrest of a suspect on Hickory Road in Central Islip, New York. Mr. Datz was filming from a public sidewalk and street, did not cross any police lines, and was not interfering with

17

police activity in any way. After the police had subdued the suspect and were carrying him to a police car, a SCPD Third Precinct sergeant approached Mr. Datz and told him to move one block away from the scene, without providing a reason. Upon information and belief, the sergeant demanded that Mr. Datz move away from the scene in an effort to prevent him from filming the police officers' treatment of the suspect, who was subsequently taken to Southside Hospital for treatment of injuries. Mr. Datz called the Public Information Office to report the incident, but no meaningful action was taken.

e.      On December 18, 2011, Mr. Datz was obstructed by Suffolk County Police Officers from filming police activity at a homicide scene on Lincoln Avenue in Brentwood, New York. Mr. Datz was filming from a public sidewalk and street, outside of the crime scene perimeter, and was not interfering with police activity in any way. After Mr. Datz had been filming for two to three minutes, the same Third Precinct sergeant from the November 16, 2011 Central Islip incident sent two officers to tell Mr. Datz that the police were expanding the crime scene perimeter and that Mr. Datz had to move away from the scene by one block. Mr. Datz drove to a different location and proceeded to film. When he later passed by the original location, he discovered that the police had not in fact expanded the crime scene perimeter after he had left. Mr. Datz called the Public Information Office to report the incident, but no meaningful action was taken.

18

f.      On April 1, 2012, SCPD Third Precinct officers interfered with Mr. Datz's

attempt to film police activity at a hit-and-run scene on the Long Island

Express service road (Express Drive South). Police cars had blocked one

lane of the two-lane road, but the second lane remained open to public

traffic. When Mr. Datz had approached approximately 100 to 200 feet

from the nearest police vehicle, a Third Precinct sergeant made hand

gestures to Mr. Datz indicating that he should stop and not come closer.

The sergeant then sent two officers over to tell Mr. Datz that he could not

film from his current location. When Mr. Datz asked where the media

could set up to film, one of the officers, Officer Godoy, asked to see Mr.

Datz's press credentials and told him that his Nassau County press

credentials were not valid in Suffolk County. Mr. Datz's credentials are in

fact valid in Suffolk County, and his constitutional right to record a scene

of police activity was not dependent on those credentials. When Mr. Datz

informed Officer Godoy that the current SCPD policy states that Nassau

County press credentials are valid in Suffolk County, Officer Godoy asked

Mr. Datz if he had a copy of the SCPD policy for Officer Godoy to

review. The second officer then told Mr. Datz to return to his car

(approximately 300 feet away), and then a third officer approached and

said that that the police were closing the road entirely and that Mr. Datz

had to leave. Mr. Datz called the Public Information Office to report the

incident, but no meaningful action was taken.

19

55. The officers involved in the above-listed incidents held positions of varying seniority within the SCPD. Supervising and senior members of the SCPD were often on the scene, or were notified of the incidents through calls to the SCPD Public Information Office.

56. Upon information and belief, none of the above-listed incidents has resulted in disciplinary actions against the officers involved.

57. Upon information and belief, there have been many other instances similar to those listed above in which SCPD officers have obstructed and/or prevented individuals and members of the press from recording police activity in public.

   (ii)    *At the Time of Mr. Datz's Arrest, SCPD Officers*
           *Acted Pursuant to an Unconstitutional Official Policy*

58. Sergeant Milton's unconstitutional arrest of Mr. Datz for recording police activity from a public location, as well as similar unconstitutional actions by other SCPD officers to prevent individuals from recording police activity in public (as illustrated in the examples above), were the direct result of the official policies of the SCPD.

59. At the time of Mr. Datz's unlawful arrest, the official policies of the Suffolk County Police Department did not affirmatively prohibit officers from preventing individuals or members of the media from recording police activity in public locations. To the contrary, the SCPD policy on "Bystanders at Police Incidents" in effect at the time of Mr. Datz's arrest, located at Chapter 9, Section 21 of the SCPD Rules and Procedures, granted SCPD officials the authority to prevent recording of police activity in public based on wholly vague standards; stated that SCPD officials "may" allow individuals to remain at police incidents and produce recorded media even if their actions are wholly lawful; and granted SCPD officers unbridled

discretion to prevent constitutionally protected recording of official police activity occurring in public.

60.     In September 2011, after Mr. Datz's unlawful arrest, and implicitly recognizing that the policy in place at the time of his arrest was unconstitutional, the SCPD revised its policies regarding the recording of police activity at locations open to the public. The revised policies, however, do not provide for any training of SCPD officers regarding the First Amendment right of the public and press to record official police conduct that occurs in public, or set forth any procedures for disciplining officers who violate this constitutional right.

61.     Even with these new policies in place, SCPD officers continue to obstruct and/or prevent individuals and members of the media from recording scenes of police activity in public in violation of the First Amendment, as illustrated by the incidents described above.

*(iii)    Suffolk County Police Officers Have Engaged in a Widespread Unconstitutional Custom and Practice of Obstructing and Preventing Individuals from Recording Police Activity*

62.     In addition to its unconstitutional official policy, at all times relevant to this complaint, Suffolk County has had a persistent, widespread custom and practice of obstructing and/or preventing members of the media from filming police activity in public locations, in violation of the First Amendment. As illustrated by the examples above, SCPD officers have regularly acted pursuant to this widespread custom and practice by, among other things, ordering members of the media to cease recording or leave public scenes, even while bystanders are allowed to remain; improperly refusing to honor valid press credentials issued by sister jurisdictions; and dramatically expanding crime scene perimeters upon arrival of the media in order to prevent recording of police activity.

63.     This custom and practice is widespread among SCPD officers, and has been frequently reported to senior officers of the SCPD and to the SCPD Public Information Office by those who have been prevented from filming police activity in public. Suffolk County has at all relevant times had knowledge of this unconstitutional custom and practice.

      *(iv)*    *Suffolk County Has Failed to Adequately Train its Officers on the* <u>*Constitutional Right to Record Police Activity in Public*</u>

64.     At all times relevant to this complaint, Suffolk County has had a policy, custom and practice of failing to adequately train its officers on the clearly established First Amendment right of the press and public to record police activity in public locations. Upon information and belief, at all times relevant to this complaint, Suffolk County failed to properly train its police recruits that individuals, including members of the media, have a First Amendment right to film or photograph police activity taking place in public. Upon information and belief, at all times relevant to this complaint, Suffolk County also failed to provide adequate refresher training to active-duty police officers on the First Amendment right of the press and public to film or photograph police activity in public places.

65.     Upon information and belief, at all times relevant to this complaint, Suffolk County also failed to adequately train its police recruits and active-duty officers that members of the media may not be excluded from areas open to the general public, and that officers may not detain, arrest or retaliate against individuals for filming or photographing police activity in public.

66.     Upon information and belief, at all times relevant to this complaint, Suffolk County also failed to adequately train its police recruits and active-duty officers that a crime scene may not be expanded for the purpose of denying these First Amendment rights.

22

67.     Suffolk County police officers regularly encounter journalists, photojournalists, and individuals recording police activity in the course of their duties. Suffolk County is aware that its officers have a history of mishandling these situations by improperly preventing journalists and the public from filming police conduct in public locations. Furthermore, Suffolk County is aware that it is a violation of the First Amendment to obstruct and/or prevent individuals from recording police activity in a public location. Such failure to adequately train shows Suffolk County's deliberate indifference to the First Amendment rights of the public and press to record police conduct in public.

### (v)     *Suffolk County Has Failed to Supervise and Discipline Its Officers Who Violate the Constitutional Right to Record Police Activity in Public*

68.     At all times relevant to this complaint, Suffolk County has had a policy, custom and practice of failing to supervise and discipline officers who unlawfully obstruct and/or prevent members of the media and the public from recording police activity conducted in public view, despite its awareness that these violations happen repeatedly.

69.     Upon information and belief, none of the SCPD officers involved in the incidents listed in paragraphs 53 and 54 above have been disciplined in any meaningful way by Suffolk County for their unlawful conduct in obstructing and/or preventing members of the media from filming police activity in public.

70.     Nor, upon information and belief, has Suffolk County appropriately disciplined Sergeant Milton for his gross violation of Mr. Datz's constitutional rights on July 29, 2011.

23

71.     Such repeated failure to supervise and discipline shows Suffolk County's deliberate indifference to the First Amendment rights of the public and press to record police conduct in public.

**(vi)     *Suffolk County's Unconstitutional Policies,***
        ***Customs and Practices Caused Mr. Datz's Unlawful Arrest***

72.     The constitutional violations that Mr. Datz suffered during his unlawful arrest were caused by Suffolk County's official unconstitutional policy; by the widespread custom and practice among SCPD officers of obstructing and/or preventing members of the media from filming police activity conducted in public view; by Suffolk County's failure to adequately train its officers about the First Amendment right of the press and public to record police activity from public locations; and by Suffolk County's failure to supervise and discipline its officers to keep them from improperly and unlawfully obstructing and/or preventing individuals from recording police activity in public locations.

73.     Sergeant Milton acted pursuant to these widespread policies, customs and practices in Suffolk County, which led him to assume that his unlawful behavior would be tolerated.  When Mr. Datz suggested calling the SCPD Public Information Office, Sergeant Milton boasted: "You can call and talk to the Commissioner for all I care. . . . You understand, I've been doing this for 30 years.  There is nothing you can hold over my head or anybody out there."

## COMPLIANCE WITH PRE-SUIT REQUIREMENTS
## FOR SUPPLEMENTAL STATE LAW CLAIMS

74.     On October 26, 2011, within 90 days after the claims herein arose, Mr. Datz served a Notice of Claim on Suffolk County in compliance with N.Y. Gen. Mun. Law § 50-e.

24

75.     On November 14, 2011, Suffolk County served Mr. Datz with a Demand for Examination pursuant to N.Y. Gen. Mun. Law § 50-h.

76.     On February 8, 2011, Suffolk County conducted its examination of Mr. Datz pursuant to N.Y. Gen. Mun. Law § 50-h.

77.     More than 30 days have elapsed since service of the Notice of Claim, and Suffolk County has neglected and refused to make payment on Mr. Datz's claims as set forth in the Notice of Claim.

78.     This action has been commenced within one year and 90 days after the happening of the events upon which the claims herein are based.

## FIRST CLAIM
**Section 1983 Claim for Violation of Plaintiff's First and Fourteenth Amendment Rights**
(Defendant MILTON)

79.     Mr. Datz repeats and realleges the allegations in Paragraphs 1 through 78 as if fully set forth herein.

80.     Observing and recording police activity in public is a legitimate means of gathering information for public dissemination that is protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment.

81.     By arresting and detaining Mr. Datz for recording police activity in public, Sergeant Milton violated Mr. Datz's clearly established First Amendment rights.

25

82.     Sergeant Milton's conduct violated a clearly established constitutional right, of which Sergeant Milton knew, or of which reasonable police officers should have known, rendering him liable to Mr. Datz under 42 U.S.C. § 1983.

83.     Sergeant Milton acted with reckless and callous indifference to Mr. Datz's First Amendment rights.

84.     As a direct and proximate result of Sergeant Milton's actions, Mr. Datz suffered damages including physical, psychological, and professional injuries.

## SECOND CLAIM
**Section 1983 Claim for Violation of Plaintiff's Fourth and Fourteenth Amendment Rights**
(Defendant MILTON)

85.     Mr. Datz repeats and realleges the allegations in Paragraphs 1 through 78 as if fully set forth herein.

86.     Under the Fourth Amendment to the United States Constitution, as applied to the State of New York under the Fourteenth Amendment, Mr. Datz has a right to be free from unreasonable searches and seizures.

87.     Sergeant Milton violated Mr. Datz's clearly established Fourth Amendment right to be free from unreasonable seizures when he arrested and detained Mr. Datz and seized his professional video camera and videotape without probable cause to believe that Mr. Datz was engaged in any criminal activity.

88.     Sergeant Milton's conduct violated a clearly established constitutional right, of which Sergeant Milton knew, or of which reasonable police officers should have known, rendering him liable to Mr. Datz under 42 U.S.C. § 1983.

89.     Sergeant Milton acted with reckless and callous indifference to Mr. Datz's Fourth Amendment rights.

90.     As a direct and proximate result of Sergeant Milton's actions, Mr. Datz suffered damages including physical, psychological, and professional injuries.

### THIRD CLAIM

**Section 1983 *Monell* Claim**
(Defendant SUFFOLK COUNTY)

91.     Mr. Datz repeats and realleges the allegations in Paragraphs 1 through 78 as if fully set forth herein.

92.     In arresting Mr. Datz for filming police activity in public, Sergeant Milton violated Mr. Datz's clearly established rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

93.     At all times relevant to this complaint, Sergeant Milton was acting under color of state law.

94.     At the time of Mr. Datz's unlawful arrest, the SCPD's official policy allowed SCPD officers to obstruct and/or prevent members of the media from recording police activity in public locations, in violation of the First Amendment.

95.     At all times relevant to this complaint Suffolk County has had a widespread custom and practice of obstructing and/or preventing members of the media from recording police activity in public locations, in violation of the First Amendment.

27

96. Suffolk County failed to adequately train its officers about the First Amendment right of the public and press to record public scenes of police activity, displaying deliberate indifference to its citizens' constitutional rights.

97. Suffolk County failed to supervise and discipline its officers for unlawfully interfering with the First Amendment right of the public and press to record public scenes of police activity, displaying deliberate indifference to its citizens' constitutional rights.

98. These unconstitutional policies, customs and practices of Suffolk County were the moving force behind Sergeant Milton's violation of Mr. Datz's constitutional rights on July 29, 2011.

99. As a direct and proximate result of Suffolk County's unconstitutional policies, customs and practices, Mr. Datz suffered damages including physical, psychological, and professional injuries.

100. Mr. Datz intends to continue his career as a professional photojournalist videotaping newsworthy police activity from public locations, but fears further obstruction, harassment and detention by Suffolk County police officers. That fear prevents Mr. Datz from doing his job as effectively as he would like and makes it more difficult for him to gather news for dissemination to the public.

## FOURTH CLAIM

### Violation of Privacy Protection Act
(Defendants MILTON and SUFFOLK COUNTY)

101. Mr. Datz repeats and realleges the allegations in Paragraphs 1 through 78 as if fully set forth herein.

28

102.     The seizure of Mr. Datz's camera and videotape by Sergeant Milton and other SCPD officers violated the Privacy Protection Act of 1980, 42 U.S.C. § 2000aa.

103.     By reason of the seizure of his camera and videotape by Sergeant Milton and other SCPD officers, Mr. Datz suffered actual damages, including the loss of licensing fees from his inability to license time-sensitive footage to news organizations.

## FIFTH CLAIM

### Violations of Article I, Section 8 and
### Article I, Section 12 of the New York State Constitution
(Defendants MILTON and SUFFOLK COUNTY)

104.     Mr. Datz repeats and realleges the allegations in Paragraphs 1 through 78 as if fully set forth herein.

105.     By reason of their conduct, Sergeant Milton and Suffolk County deprived Mr. Datz of his rights to freedom of speech and of the press under Article I, Section 8 of the New York Constitution, and to freedom from arrest without probable cause under Article I, Section 12 of the New York State Constitution.

106.     Sergeant Milton acted with reckless and callous indifference to Mr. Datz's rights under Article I, Sections 8 and 12 to the New York State Constitution.

107.     The unconstitutional policies, customs and practices of Suffolk County were the moving force behind Sergeant Milton's violation of Mr. Datz's New York State constitutional rights on July 29, 2011.

108.     As a direct and proximate result of Sergeant Milton's actions, Mr. Datz suffered damages including physical, psychological, and professional injuries.

29

## SIXTH CLAIM

### False Arrest
(Defendants MILTON and SUFFOLK COUNTY)

109.    Mr. Datz repeats and realleges the allegations in Paragraphs 1 through 78 as if fully set forth herein.

110.    Sergeant Milton intended to confine Mr. Datz when he arrested him and placed him in police custody without probable cause.

111.    Mr. Datz was aware of his confinement by Sergeant Milton.

112.    Mr. Datz did not consent to the confinement.

113.    Sergeant Milton arrested Mr. Datz without probable cause, and his actions were not otherwise privileged.

114.    Sergeant Milton's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

115.    Sergeant Milton's conduct complained of herein was committed within the scope of his employment by Defendant Suffolk County, and his actions were approved, consented to, and ratified by superior officers of the SCPD acting within the scope of their employment.

116.    As a direct and proximate result of Sergeant Milton's actions, Mr. Datz suffered damages including physical, psychological, and professional injuries.

## SEVENTH CLAIM
### Assault
(Defendants MILTON and SUFFOLK COUNTY)

117.    Mr. Datz repeats and realleges the allegations in Paragraphs 1 through 78 as if fully set forth herein.

118.    Before unlawfully arresting Mr. Datz, Sergeant Milton menaced Mr. Datz and intentionally placed him in reasonable apprehension of immediate physical harm by driving his patrol car directly at Mr. Datz at high speed.

119.    Sergeant Milton knew that his actions would place Mr. Datz in apprehension of immediate physical harm.

120.    Sergeant Milton's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

121.    Sergeant Milton's conduct complained of herein was committed within the scope of his employment by Defendant Suffolk County, and his actions were approved, consented to, and ratified by superior officers of the SCPD acting within the scope of their employment.

122.    As a direct and proximate result of Sergeant Milton's actions, Mr. Datz suffered damages including physical, psychological, and professional injuries.

## EIGHTH CLAIM
### Battery
(Defendants MILTON and SUFFOLK COUNTY)

123.    Mr. Datz repeats and realleges the allegations in Paragraphs 1 through 78 as if fully set forth herein.

31

124.  In the course of his unlawful arrest of Mr. Datz, Sergeant Milton intentionally wrenched Mr. Datz's camera from his shoulder, pushed Mr. Datz against a car, and forced him into handcuffs behind his back.

125.  Mr. Datz did not consent to the unlawful offensive contact by Sergeant Milton.

126.  Sergeant Milton acted without justification or excuse for his actions.

127.  Sergeant Milton's actions were flagrant, willful, wanton and reckless, and displayed a high degree of moral culpability.

128.  Sergeant Milton's conduct complained of herein was committed within the scope of his employment by Defendant Suffolk County, and his actions were approved, consented to, and ratified by superior officers of the SCPD acting within the scope of their employment.

129.  As a direct and proximate result of Sergeant Milton's actions, Mr. Datz suffered damages including physical, psychological, and professional injuries.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant relief as follows:

a.  A declaratory judgment that Mr. Datz's arrest for filming police activity in a public location violated his clearly established constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, and under Article I, Sections 8 and 12 of the New York State Constitution;

b.  An award of compensatory damages against Defendants Suffolk County and Milton for the physical, psychological, and professional damages that

32

Mr. Datz suffered as a result of his unlawful arrest and detention on July 29, 2011, in an amount to be determined at trial;

c.     Pursuant to 42 U.S.C. § 2000aa-(6)(a) and (f), an award against Defendants Suffolk County and Milton of the actual damages that Mr. Datz suffered as a result of the unlawful seizure of his video camera and videotape;

d.     An award of punitive damages against Defendant Milton, and an award of punitive damages against Suffolk County on Plaintiff's state law claims, in an amount to be determined at trial;

e.     Injunctive relief (i) barring Suffolk County from arresting, detaining, obstructing or otherwise interfering with journalists and members of the public who are engaged in recording of police activity in public places; and (ii) directing Suffolk County to develop and implement a comprehensive and effective policy to protect the First Amendment rights of the public and press to observe and record police activity in public, including appropriate training and procedures to test the effectiveness of that policy on the ground and to discipline appropriately those who breach it;

f.     Pursuant to 42 U.S.C. §§ 1988 and 2000aa-6(f), an award of the costs and expenses of prosecuting this action, including reasonable attorney's fees; and

33

g.   Such other relief that this Court may deem just, proper, and appropriate.

Dated: New York, New York
April 11, 2012

DAVIS WRIGHT TREMAINE LLP

By: _____

Robert D. Balin
Samuel M. Bayard
Alison B. Schary

1633 Broadway, 27th floor
New York, New York 10019
(212) 489-8230
robbalin@dwt.com
samuelbayard@dwt.com
alisonschary@dwt.com

- and -

Corey Stoughton
New York Civil Liberties Union Foundation
125 Broad Street
New York, New York 10004
(212) 607-3300
cstoughton@nyclu.org

*Attorneys for Plaintiff*
*Philip Datz*

Of Counsel:

Mickey H. Osterreicher
National Press Photographers Association
1100 M&T Center
3 Fountain Plaza
Buffalo, New York 14203
(716) 566-1484
lawyer@nppa.org

34